UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KAREN A. HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:10CV321 RWS |
| | ) (TIA) |
| MICHAEL J. ASTRUE, COMMISSIONER | ) |
| OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The case was referred to the undersigned pursuant to 28 U.S.C. § 636(b).

**I. Procedural History**

On September 10, 2007, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Tr. 71-76) Plaintiff alleged disability beginning November 1, 2006 due to ulcerative colitis, sleep apnea, control problem, and diabetes mellitus. (Tr. 42) Plaintiff's applications were denied on October 16, 2007, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 40-47, 50-51) On February 12, 2009, Plaintiff appeared and testified at hearing before an ALJ. (Tr.20-39) In a decision dated February 26, 2009, the ALJ determined that Plaintiff was not under a disability from November 1, 2006 through the date of the decision. (Tr. 13-19) On January 4, 2010, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision

of the Commissioner.

## II. Evidence Before the ALJ

On February 12, 2009, Plaintiff appeared at a hearing before an ALJ and was first questioned by her attorney. Plaintiff testified that she last worked from 1990 to 2005. She was fired from that position because she could not get to the bathroom fast enough due to ulcerative colitis. She needed to go home and change her clothes. Plaintiff worked in quality control for a factory that manufactured microwave popcorn bags. Her duties included inspecting boxes, along with testing and checking products. Plaintiff walked a lot on the job, checking about 4 lines every hour. Plaintiff would collect bags to make sure they were properly sealed and pop them or fill them with oil. She would then bring the bags to the lab. She testified that she stood and walked for an hour, then sat for about 15 minutes. The original building was 2 stories, requiring her to go up and down stairs. When the company relocated to a new building, she had to walk a long distance from the lab to the other side of the building. Plaintiff specified that walking was difficult due to neuropathy in her feet, plantar fasciitis, and arthritis in her knee. The heaviest weight that Plaintiff lifted was about 45 pounds, consisting of 1,500 to 2,000 finished boxes. Plaintiff would lift the boxes off the pallet and give them to assistants for stacking. In addition, if she saw a problem with one of the bags she previously checked, she had to pull a large box, set it aside, and go through it. Plaintiff worked briefly after that job at another factory. Her supervisor saw her coming out the bathroom and told her it was not her break time. (Tr. 23-28)

Plaintiff also testified about her health problems. Plaintiff had ulcerative colitis, irritable bowel syndrome, and other digestive problems. Even with treatment and medication, she had trouble getting her symptoms under control. Plaintiff also had arthritis in her back, hips, and legs. If she sat

too long, her back and hips hurt. She could only stand for 30 minutes due to pain in her legs. In addition, Plaintiff testified that she had a tumor in her left hip, which caused pain in her buttocks when sitting for long periods. When she stood, her back hurt. Plaintiff stated that she had arthritis in her right knee which prevented her from stooping and taking steps. She took Tylenol for pain because arthritis medication irritated her stomach. Plaintiff further testified that she had a frozen right shoulder which caused her arm to go numb for no reason. She had carpal tunnel syndrome twice on each hand, a problem with the nerves in her left elbow, and a problem with the radial nerve in her right arm. Plaintiff stated that she had surgeries in 1998 or 1999. As a result of the surgeries, she had a trigger thumb requiring additional surgery. She still had numbness in her left hand which made it hard to grip things. (Tr. 29-32)

Plaintiff was also treated for diabetes which was out of control, despite medication. She saw Dr. Cass from the county health clinic, Dr. Pelican at the GI clinic, and Dr. Thornton for cataracts in her eyes. She did not yet require eye surgery. In addition, Plaintiff had sleep apnea and used a CPAP machine every night. She was able to sleep about 4 or 5 hours each night. She was tired during the day and frequently took naps. Although Plaintiff described the pain from walking as feeling like she was "walking on broken glass" along with numbness, she did not use any assistive devices. (Tr. 32-34)

With regard to her living situation, Plaintiff testified that she lived with her son. She did some household chores, but her son did most of them. She was unable to vacuum due to problems with her shoulder and arms. She could do dishes and put laundry in the washer. However, her son carried up the laundry. Plaintiff no longer did yard work. Although she still drove, her son took her most places. She did not go very many places due to her ulcerative colitis which caused her to have

3

accidents. During the day, Plaintiff watched TV, did crossword puzzles, and read books and magazines. (Tr. 34-36)

Plaintiff also stated that she had restless leg syndrome. She took up to 5 Neurontin pills a day. If she did not take 2 pills before she went to bed, she would wake up with Charlie horses, leg spasms, and cramps. Her daily naps lasted from an hour to an hour and a half. Plaintiff also took medication at night for her rapid heart rate. (Tr. 36-37)

The ALJ also questioned Plaintiff regarding her impairments. Plaintiff stated that Dr. Impey diagnosed ulcerative colitis but that she currently saw Dr. Pelican. She did go grocery shopping unless she had abdominal cramps. She did not attend church, nor did she smoke or drink alcohol. She did use a computer for shopping and news. Her hobbies included crossword puzzles, books, and magazines. She used to go to the park for picnics but no longer participated in that hobby. (Tr. 37-39)

A Disability Report – Adult completed by the Plaintiff indicated that she measured 5 feet and weighed 252 pounds. She listed ulcerative colitis and sleep apnea as her illnesses that limited her ability to work because she had control problems. She stated that she became unable to work on November 1, 2006. Although she tried working for a temporary agency after, she stopped working altogether on January 9, 2007. (Tr. 103-10)

In a Function Report – Adult dated October 13, 2007, Plaintiff reported that she performed daily activities around the house and liked to do crafts. She could no longer go out for social activities or to the mall. Plaintiff had no problems with personal care. She was able to prepare meals daily, clean, do laundry, sweep, mop, and do dishes. She went outside every day and was able to drive. She went shopping for groceries for about 30 minutes at a time. Her interests included

4

watching TV and movies, sewing, scrapbooking, and using the computer. Plaintiff had some bad days when she stayed in bed. She spent time with her son and talked to friends on the phone every couple of days. With regard to changes in her social activities, Plaintiff reported that she no longer went to friends' houses, to restaurants, or on picnics. Her impairments affected lifting, squatting, bending, standing, walking, kneeling, and stair climbing. She stated that arthritis in her feet, knees, back, and neck prevented her from doing these things. In addition, Plaintiff reported that she could walk 3 blocks before needing to rest for 10 to 15 minutes. Plaintiff stated that her ongoing problem was with using the bathroom. She had control problems which sometimes caused messes in public places. (Tr. 111-18)

### III. Medical Evidence

Treatment notes dated January 16, 2006 indicated diabetes poorly controlled, as well as blood in the stool. On January 23, 2006, the Department of Pathology at Des Peres Hospital performed a cecal mucosa, endoscopic biopsy after Plaintiff complained of rectal bleeding. The diagnosis was mild focal active cryptitis. (Tr. 169, 188)

During a doctors appointment on May 15, 2006, Plaintiff reported palpitations 2-3 times a day. In addition, she reported continued irritable bowel symptoms. The physician recommended a treadmill stress test. (Tr. 187) At the request of Dr. Michael Impey, Plaintiff underwent blood testing. Results showed high triglycerides, cholesterol, and glucose. (Tr. 185) A myocardial performance rest/stress test on May 19, 2006 was normal, however, Plaintiff continued to complain to Dr. Impey of palpitations on May 23, 2006. (Tr. 183-84)

On February 19, 2007, Dr. Sajidul H. Ansari examined Plaintiff at the request of Dr. Impey. Plaintiff reported diarrhea over the past two years. Dr. Ansari noted a normal colonoscopy and

5

biopsies in January 2006. Plaintiff also reported abdominal cramps before the diarrhea and rectal urgency with occasional incontinence if she was unable to reach the bathroom right away. Dr. Ansari's impression was persistent diarrhea, usually worse after eating, with associated abdominal cramps and worse with stress. He suspected the underlying diarrhea was due to irritable bowel syndrome. He prescribed a trial of Bentyl. A stool sample taken on February 21, 2006 was positive for salmonella, and Plaintiff was prescribed Cipro. (Tr. 155, 181-82)

Plaintiff returned to Dr. Ansari on May 20, 2007. She reported that her diarrhea was improved since her Cipro treatment. However she continued to experience urgency with eating. The Bentyl took the edge off but did not eliminate ally her symptoms. Dr. Ansari prescribed Levsin and noted that Plaintiff's blood work was normal except for a glucose of 212. She was to return in 3 months. (Tr. 154)

On June 18, 2007, Plaintiff informed Dr. Ansari that the Bentyl and Levsin had not helped much, and she continued to have diarrhea. She reported 7 to 10 bowel movements per day. Dr. Ansari suspected underlying IBS type diarrhea, as there did not appear to be a persistent infectious source of the diarrhea. He also considered mild chronic inflammation that had progressed over time. He prescribed Pamine Forte and noted that Plaintiff may need a repeat colonoscopy to see if her cryptitis had progressed. (Tr. 152)

Plaintiff returned to Dr. Ansari in July 30, 2007 with complaints of diarrhea of unclear etiology. Plaintiff reported that she had bowel movements anywhere from 2 times a day on a good day to 5 or 6 times on a bad day. The stools were loose and watery with no blood and were accompanied by crampy abdominal pain. Medications had not helped. Dr. Ansari recommended a repeat colonoscopy. (Tr. 151) On August 3, 2007, Plaintiff underwent a colonoscopy, which was

normal except for hemorrhoids. (Tr. 144-49)

On August 9, 2007, Plaintiff complained of near fainting spells during an office visit with Dr. Impey. Blood testing revealed high glucose. Dr. Impey opined that Plaintiff was dehydrated. He decided to treat Plaintiff for Ulcerative Colitis despite the fact that the biopsy did not confirm this diagnosis. He also noted that Plaintiff needed a sleep study for suspected sleep apnea and a stress test. (Tr. 173-76, 192)

Plaintiff returned to Dr. Impey on August 22, 2007, reporting that the medication was helping, and she experienced only one stool daily. Dr. Impey prescribed a sleep study, which was performed on August 23, 2007. The study revealed moderate obstructive sleep apnea with good sleep efficiency. The report also indicated that Plaintiff would qualify for a CPAP titration study and that stress could be contributing to her restless sleep. In addition, Plaintiff was advised to lose weight. (Tr. 170, 194)

Plaintiff saw Linda S. Trevanthan, FNP, on December 14, 2007. Nurse Trevanthan diagnosed Diabetes Mellitus Type II uncontrolled due to possible increases in insulin resistence; hypertension uncontrolled due to noncompliance; restless leg syndrome controlled with medication; ulcerative colitis controlled with medication; insomnia controlled with medication; and stage II renal insufficiency due to diabetes and long-standing high blood pressure. (Tr. 264-65)

On January 17, 2008, Plaintiff returned to Nurse Trevanthan for medication refills. She assessed Diabetes Mellitus Type II uncontrolled; hypertension, benign; ulcerative colitis, unspecified; sleep apnea with hypersomnia; and osteoarthrosis, generalized, involving multiple sites. Nurse Trevanthan prescribed a CPAP machine. (Tr. 258, 260-61)

On February 14, 2008, Plaintiff's glucose level was high, but she reported no complaints.

Nurse Trevanthan noted that the restless leg syndrome bothered Plaintiff at night, but the CPAP helped her sleep. She suggested increasing Plaintiff's Neurontin. In addition, she assessed Diabetes Mellitus Type II without mention of complication; hypertension, benign; and restless leg syndrome. Plaintiff was instructed to keep a blood sugar log and return in 3 months. (Tr. 250, 255-56)

Plaintiff saw Dr. George Pelican on February 27, 2008 for complaints of diarrhea and occasional blood. Dr. Pelican noted that Plaintiff's biopsy information was compatible with ulcerative colitis. Plaintiff reported that Asacol usually calmed down her colitis. Dr. Pelican's diagnostic impression was ulcerative colitis by history. He recommended that Plaintiff continue taking Asacol. In addition, he noted Plaintiff's diabetes by history and exogenous obesity. She was to return in 4 months. (Tr. 237)

Dr. Kyra A. Cass examined Plaintiff on May 15, 2008 for a follow-up visit. Plaintiff reported weight gain with the increased insulin. She did not bring in her blood sugar log. Plaintiff also complained of chills and cough. Dr. Cass diagnosed Diabetes Mellitus Type II, without mention of complication and uncontrolled; hypertension, benign; and ulcerative colitis, unspecified. (Tr. 252-53)

On June 27, 2008, Dr. Guy Vangoidsenhoven examined Plaintiff, who reported that she was doing pretty well. She continued to have loose bowel movements and occasional spells of more severe diarrhea. However, she was not passing blood or mucus. She also reported tenderness and discomfort in the left lower quadrant. Upon examination, Plaintiff's abdomen was grossly obese but showed no tenderness on palpation. Dr. Vangoidsenhoven's impression was ulcerative colitis under good control. He increased the dose of Plaintiff's Lomotil to try to control the frequency of her bowel movements. (Tr. 230)

Plaintiff returned to Dr. Cass on October 15, 2008 with complaints of chronic pain in feet and

ankles. She also sought a flu vaccination and referral for a G.I. appointment. Dr. Cass assessed Diabetes Mellitus Type II without mention of complication and uncontrolled; Fibromatosis, plantar fascial; ulcerative colitis, unspecified; hypertension; and restless leg syndrome. Dr. Cass ordered blood tests, recommended a nutrition, advised regarding heel stretching for plantar fasciitis, and refilled prescriptions. (Tr. 244-45)

On November 5, 2008, Plaintiff reported that she was following a diet but not exercising. Her heels were improving. Dr. Cass noted that Plaintiff's diabetes remained uncontrolled, and she had not been taking insulin. Neurontin worked well for Plaintiff's restless leg syndrome. (Tr. 279) Plaintiff also met with Nancy Keller, a registered dietician, on that same date. Plaintiff reported that she was always thirsty, always going to the bathroom, and very tired. She believed she was managing her diabetes well. Ms. Keller noted that Plaintiff was unable to recall agreed-upon changes and lacked appreciation of the importance of making nutrition-related changes. With regard to overall compliance potential, she found that Plaintiff rarely demonstrated comprehension, sometimes demonstrated receptivity, and never demonstrated adherence. Plaintiff stated that she would think about trying to eat more regularly. While she was medically cleared for exercise, Plaintiff was not considering exercise. (Tr. 278)

## IV. The ALJ's Determination

In a decision dated February 26, 2009, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. She had not engaged in substantial gainful activity since November 1, 2006, her alleged onset date. The ALJ further found that Plaintiff had the severe impairments of ulcerative colitis, diabetes mellitus, restless leg syndrome, sleep apnea, and obesity. However, she did not have an impairment or combination of impairments

that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15)

After considering the record, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform the full range of medium work as defined in the regulations. The ALJ noted Plaintiff's testimony and her medical history. The ALJ noted that Plaintiff's reports in the medical records were inconsistent and detracted from her credibility. In addition, no physician noted that Plaintiff was in distress or was unable to work, which also detracted from her credibility. The ALJ also referenced, then dismissed as lay opinion, a State Agency physical residual functional capacity report. (Tr. 16-18)

Next, the ALJ found that Plaintiff was capable of performing her past relevant work as a quality control inspector, which did not require the performance of work-related activities precluded by her RFC. Thus, the ALJ concluded that Plaintiff had not been under a disability from November 1, 2006 through the date of the decision and was not entitled to a period of disability, disability insurance benefits, or supplemental security income. (Tr. 18-19)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that

she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises 4 arguments in her Brief in Support of the Complaint. First, she asserts that the transcript may not be complete. She also contends that the decision is not based on substantial evidence because the ALJ failed to fully and fairly develop the record. Next, Plaintiff argues that the ALJ failed to properly consider Plaintiff's credibility. Finally, Plaintiff asserts that the ALJ failed to properly consider Plaintiff's ability to perform her past relevant work. The Defendant, on the other

---

[1] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

hand, maintains that the ALJ properly assessed Plaintiff's credibility, properly fulfilled his duty to develop the record, properly weighed the evidence of record, and properly assessed Plaintiff's RFC and held that she retained the RFC to perform her past relevant work as a quality control inspector. The undersigned finds that substantial evidence does not support the ALJ's determination and that this case should be remanded for further review.

The Plaintiff asserts that the ALJ failed to fully and fairly develop the record with regard to Plaintiff's RFC because none of the treating physicians rendered an opinion regarding Plaintiff's ability to function in the workplace. The undersigned agrees.

Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present).

The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the

13

workplace." Tinervia v. Astrue, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); see also Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' . . . ."). In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted).

Defendant argues that Plaintiff had the burden to provide medical evidence to demonstrate that she was disabled and that the RFC record was fully developed. Specifically, Defendant points out Plaintiff's testimony regarding the job requirements of her past relevant work and daily activities, along with the fact that Plaintiff's providers determined that she was capable of exercise. Although the Plaintiff has the burden of proof at step four of the sequential process, "the ALJ bears the primary responsibility for determining a plaintiff's RFC." Geaslin v. Astrue, No. 4:07CV1210 SNLJ/AGF, 2008 WL 48844748, at *8 (E.D. Mo. Nov. 4, 2008) (citation omitted).

The record contains no medical opinion regarding how Plaintiff's impairments affect her ability to function in the workplace, and the ALJ may not rely upon his own inferences from the medical reports. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). While she was medically cleared to exercise, none of her treating physicians speak to Plaintiff's ability to perform sustained work activities. The Court finds, therefore, that substantial evidence does not support the ALJ's RFC determination, and the case should be remanded for further development of the record "to determine, based on substantial evidence, the degree to which [Plaintiff's] . . . impairments limited [her] ability to engage in work-related activities." Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001) (citation

omitted). See also Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002); Geaslin, 2008 WL 4844748, at *8. On remand, the ALJ should contact Plaintiff's treating physicians or order consultative examinations to determine Plaintiff's residual functional capacity. Nevland, 204 F.3d at 858. In addition, the ALJ may wish to further elaborate on Plaintiff's ability to perform her past relevant work, should the ALJ draw the same conclusion on remand and after full development of the record. Based on the foregoing, the undersigned finds that this case should be remanded for further proceedings.

Accordingly,

**IT IS HEREBY RECOMMENDED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

    /s/ Terry I. Adelman  
UNITED STATES MAGISTRATE JUDGE

Dated this   28th   day of February, 2011.